**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **SANDRA CLEVENGER CONNELLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:06-CV-00200** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Plaintiff Sandra Connelly appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[2]

(*See* Docket # 1.)  For the reasons set forth herein, the Commissioner's decision will be

REVERSED, and the case will be REMANDED to the Commissioner for further proceedings.

**I.  PROCEDURAL AND FACTUAL BACKGROUND**[3]

*A.  Procedural History*

Connelly applied for DIB on July 22, 2003, alleging that she became disabled two weeks

earlier, on July 9, 2003. (Tr. 85-87.)  The Commissioner denied her application initially and

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and thus he is automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

[2] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[3] The administrative record in this case is voluminous (830 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

upon reconsideration, and Connelly requested an administrative hearing. (Tr. 32-44.) On November 9, 2004, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Connelly, who was represented by counsel, and a vocational expert testified. (Tr. 806-30.) On June 24, 2005, the ALJ rendered an unfavorable decision to Connelly, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform her past relevant work as a production scheduler/planner. (Tr. 18-31.) The Appeals Council denied Connelly's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 8.) Accordingly, Connelly filed a complaint with this Court on May 15, 2006, seeking relief from the Commissioner's final decision. (Docket # 1.)

### B.  Background and Daily Activities

At the time of the ALJ's decision, Connelly was fifty-eight years old and had a high school education. (Tr. 85, 96.) She had worked for Superior Essex for thirty-six years, the last twenty-five years as a production scheduler/planner. (Tr. 90-91, 811-12.) On July 9, 2003, Connelly, along with forty to fifty other employees, was laid off due to a "down turn in business." (Tr. 811, 813, 823.) Just two weeks later, Connelly filed an application for DIB alleging that she became disabled as of her lay-off date, due to fibromyalgia, osteoarthritis, rheumatoid arthritis, chronic fatigue syndrome, hypertension, and depression. (Tr. 90, 813.) Connelly explained that during her last few years at Essex she took medical leave seven different times, varying in length from two to six weeks; that she began making mistakes at work, was easily upset, and was frequently absent due to her health problems; and that she "would collapse" from exhaustion at the end of a workday. (Tr. 813-16.)

At the hearing, Connelly testified that she lives in a two-story farmhouse, in which she

resides independently on the first floor while her husband, who she is in the process of divorcing, resides independently on the second floor. (Tr. 810.)  She reported that she performs her own self care and light household work, though her husband does most of the cooking, and that she requires "some assistance" when she goes grocery shopping. (Tr. 825-826.)  Connelly drives her own car and enjoys reading and watching movies in her leisure time. (Tr. 826.)

Connelly further testified that she and her husband have an array of pets, including two horses, two dogs, five cats, and a frog. (Tr. 824.)  She explained that on a typical day she does "most" of the care for these animals, but that when she is sick, her husband performs the care. (Tr. 824-25.)  She stated that she has ridden her horse twice in the last year, but realized that she can no longer do that activity; consequently, she confided that she and her husband were trying to sell their horses. (Tr. 826-27.)

When asked to describe her pain, Connelly first explained that she has headaches every day. (Tr. 816-17.)  She also explained that her fibromyalgia causes her to feel "tightness" when working in front of a computer, that she "lose[s] the feeling in [her] fingers some times," and that she occasionally experiences a "burning sensation down [her] arms and into [her] hands." (Tr. 816-17.)  She further reported that she has arthritis in her hands which caused bunions on her fingers, making it difficult to type. (Tr. 817.)   She confided that her arthritis is worsened by humidity, so she often stays inside in air conditioning. (Tr. 817.)  Connelly also explained that she has low back pain due to "nerve damage from [her] surgery in '99." (Tr. 817.)

 As to her physical capacity, Connelly stated that she could sit for "maybe an hour or two" before needing to change positions and that she "ha[s] a lot less pain when [she] [is] mobile and walking rather than sitting." (Tr. 822-23.)  To help alleviate her pain, Connelly stated that

she takes a "vast number" of medications and that she has tried cortizone shots and physical therapy in the past. (Tr. 816-17.)  She also stated that she naps once every day for "as short as 35 minutes or as long as four hours." (Tr. 819.)  If she misses her nap, Connelly stated that she feels exhausted and that it catches up with her the next day, resulting in her "spending almost all day in bed." (Tr. 819.)

As to her mental status, Connelly explains that she sees her psychiatrist every three months for medication management. (Tr. 820.)  She also reported that she participates in mental health counseling once a week, stating that she has allowed her childhood rage to turn inward. (Tr. 821.)  Connelly also stated that she suffers from panic attacks intermittently. (Tr. 821-22.)

### C. Summary of the Medical Evidence Pertaining to Connelly's Physical Impairments

1. <u>Dr. Brandenberger</u>

Connelly has been under the care of Dr. E. Jon Brandenberger, her family practitioner, since 1981. (Tr. 563-64.)  On October 29, 2004, Dr. Brandenberger reported that for the past several years Connelly has had a dramatic series of medical problems that culminated in her inability to perform work as a production planner/scheduler. (Tr. 563-64.)  He reported that Connelly had multiple chronic pain syndromes including rheumatoid arthritis-generalized, cervical disk disease-herniation and spinal stenosis at multiple levels, generalized osteoarthritis, fibromyalgia, bilateral foot pain secondary to rheumatoid arthritis status post multiple foot surgeries; anxiety and depression, chronic; hypertension, controlled; chronic headaches; status post bilateral silicone breast implants, leaking, subsequently removed; irritable bowel disease; and carpal tunnel syndrome, bilateral. (Tr. 563-64.)  He opined that Connelly was unable to perform her past work because of severe generalized pain primarily in her hands, feet, and neck;

that she was unable to remain in a sitting position for hours at a time; and that, due to her need to take multiple medications, her alertness and cognitive abilities were blunted and caused her to be less than capable of performing tasks. (Tr. 564.)

2. Fort Wayne Orthopaedics

Between November 2000 and January 2003, Connelly was treated by two podiatrists for foot problems and underwent three foot surgeries. (Tr. 224-26, 229, 237-42, 246, 599-601.)  In January 2004, Connelly injured her left foot in a fall and ultimately was referred for pain management services. (Tr. 578, 585.)  Consequently, on October 26, 2004, Conelly was evaluated by Dr. Mark Zolman, complaining that she experienced a burning sensation and tenderness in her feet; that on a ten-point scale, her pain at its worst was a "seven" and at its best was a "two"; and that her symptoms were intermittent and were aggravated by standing, but that she did get some relief by elevating her feet and soaking them. (Tr. 655-57.)

Upon physical examination, Dr. Zolman observed that Connelly's gait was mildly antalgic, that her strength was normal, that her straight leg raise was negative, that her sensation was decreased to light touch at the bilateral proximal tibia, and that there was decreased cold sensation in the bilateral ankles. (Tr. 656.)  Dr. Zolman noted that Connelly's EMG was consistent with chronic bilateral L5 and S1 radiculopathies and recommended that she undergo an MRI of the lumbar spine.

On November 8, 2004, Connelly underwent an MRI, the results of which showed degenerative disk changes at the L4-5 level and anterior listhesis of L4 on L5; Dr. Zolman then recommended that Connelly undergo a short course of physical therapy. (Tr. 664, 668.)  Two weeks later, Connelly returned to Dr. Zolman, who assigned her a diagnosis of bilateral L5-S1

radiculopathy and bilateral lower extremity pain and paresthesias and noted that she had "not begun physical therapy yet due to some personal issues." (Tr. 668.)  Dr. Zolman then clarified that physical therapy may be indicated for Connelly's lumbar spine, but not until after Connelly completed her intervention with Dr. Bojrab and her upcoming cervical surgery by Dr. Canavati (to be discussed *infra*). (Tr. 669.)

3. Dr. Canavati

On July 23, 2002, Connelly visited Dr. Isa Canavati, a neurosurgeon, for a neurosurgical evaluation. (Tr. 139-41.)  He noted that Connelly complained of a constant aching sensation in both extremities, pain into the midlumbar area with radiation in the buttocks and upper thighs, and frequent headaches, which she stated had progressed in the last nine months. (Tr. 139-41.) Upon clinical examination, Dr. Canavati noted that Connelly had tenderness at the base of her neck with restriction of anterior flexion of the spine and restriction of lateral rotation of the neck, but that her gait and station were steady. (Tr. 139-41.)  He reviewed her recent MRI, which showed multi-level degenerative disk disease from C2-C7 with multi-level foraminal compromise and right carpal tunnel syndrome but no cervical radiculopathy. (Tr. 139-41.)  He recommended conservative treatment with Elavil and physical therapy. (Tr. 139-41.)

In April 2004, Connelly returned to Dr. Canavati for another neurosurgical evaluation, complaining of cervical pain with radiation into the upper extremities, increased frequency of headaches, limited neck mobility, and insomnia. (Tr. 486-87.)  He noted that she had undergone an extensive course of treatment, but that her symptoms continued to progress. (Tr. 486-87.) Upon physical examination, Dr. Canavati recorded diffuse tenderness in Connelly's cervical area;  restriction of all motions of the cervical spine; weakness upon motor examination; and

6

hypesthesia of the right dorsal aspect of the arms and forearms bilaterally upon sensory examination. (Tr. 486-87.)  Dr. Canavati observed that Connelly's MRI of the cervical region showed significant degenerative disk disease from C3 through C7, with a collapse of disk space, kyphotic deformity, and severe bilateral foraminal stenosis at the C4-5 and C6-7 levels. (Tr. 486-87.)  Dr. Canavati then gave Connelly the choice of continuing conservative treatment or undergoing a cervical diskectomy and fusion of the C5-6 and C6-7 levels. (Tr. 486-87.)

On June 28, 2004, Connelly returned to Dr. Canavati, complaining of increasing lower back pain. (Tr. 480.)  A CT scan showed evidence of L5-S1 spondylosis and spondylolisthesis, which he thought explained a great deal of her lower back pain. (Tr. 480.)  Connelly reported that her primary concern was her neck and upper extremity pain and consequently decided that she would undergo the cervical diskectomy and fusion. (Tr. 480.)

On October 29, 2004, Dr. Canavati provided a medical source statement on Connelly's behalf, assigning her diagnoses of degenerative disk disease C3-C7, bilateral foraminal stenosis at C5-6 and C6-7, disk herniation and stenosis, and L5-S1 spondylosis and spondylolisthesis. (Tr. 565-67.)  He identified clinical and objective signs as a history of rheumatoid arthritis, fibromyalgia, and chronic pain syndrome. (Tr. 565-67.)  He opined that Connelly could only occasionally look down and look up, rarely turn her head to the right or left, and frequently hold her head in a static position. (Tr. 567.)  He also stated that Connelly could use her hands to grasp and turn objects only five percent of a workday, that she could perform reaching only ten percent of a workday, and that she could not perform work involving fine finger manipulation. (Tr. 567.)

On November 29, 2004, Connelly underwent an anterior cervical diskectomy, fusion of C5-6 and C6-C7, allograft, and plate fixation performed by Dr. Canavati, which was well-

tolerated. (Tr. 674.)

4. Dr. Ko

On January 15, 2003, Connelly visited Dr. Steven Ko, a rheumatologist. (Tr. 352-55.) On physical examination, Dr. Ko noted that Connelly had partial subluxation of the left first CMC joint, a hallux valgus deformity of the right first MCP joint, and symmetric joint space narrowing of the second and third MCPs. (Tr. 352-55.)  He found seven out of eighteen possible fibromyalgia tender points, mild in intensity. (Tr. 352-55.)  He assigned her a diagnosis of a history of ANA, rule out connective tissue disorder; history of rheumatoid arthritis with incomplete response to Methotrexate which needs confirmation; fibromyalgia/chronic fatigue syndrome; hypertension; osteoarthritis involving the spine, and disk disease; and history of depression. (Tr. 352-55.)  He adjusted her medications and continued her exercise program for fibromyalgia. (Tr. 352-55.)  The following month Connelly returned to Dr. Ko, who noted that her x-rays revealed joint space narrowing at the second and third metacarpophalangeal joints bilaterally without any boney erosions and sclerotic changes at the first CMC joints bilaterally; he also noted that her lab results showed normal rheumatoid factor. (Tr. 354.)

Connelly next visited Dr. Ko in August 2003, reporting some improvement in her neck pain after a local injection, that her sleep was satisfactory but still interrupted, and that she still suffered from low back pain with radiation and fatigue. (Tr. 329.)  Three weeks later, Connelly called Dr. Ko, reporting that the Tramadol was not helping, that she had fatigue and pain, and that the bones in her hands hurt; she called again a week later to report the same problems. (Tr. 327, 329.)  In mid-September, Connelly phoned Dr. Ko for an adjustment to her pain medication, stating that she was in much distress, that the Ultram was not helping, that she could not keep

8

living on her couch, and that she was considering seeing a psychiatrist for her pain issues. (Tr. 325.)  In October 2003, Connelly visited Dr. Ko, reporting that she continued to have pain on and off and that she still woke up in the morning feeling unrefreshed; his impression was fibromyalgia with persistent tender points and non-restorative sleep. (Tr. 319.)

In December 2003, Connelly called Dr. Ko, stating that she needed a refill of the Darvocet, that she had a constant headache, and that she was experiencing pain in her right hip, buttock, shoulder, and leg. (Tr. 317.)  A few days later she called Dr. Ko again, reporting that she had a constant headache, that the Darvocet was not helping, and that she was experiencing poor sleep. (Tr. 317.)  In mid-January of 2004, Connelly phoned Dr. Ko about a chronic headache, stating that she had not been able to eat, sleep, or turn her head; she called again about a week later concerning continued headaches, stating that she had gone to a chiropractor but obtained no relief. (Tr. 309-10.)  She requested medication to take her pain away, reporting that she "could not go on like this." (Tr. 309.)

On February 10, 2004, Connelly complained to Dr. Ko of neck pain and difficulty with neck flexion, extension, and lateral rotation, reporting that she also had difficulty getting restful sleep. (Tr. 300.)  His impression was fibromyalgia with increasing multiple tender points and persistent neck pain with decreased range of motion; rule out cervical herniated nuclear pulposus or other abnormalities; and osteopenia. (Tr. 300.)  He prescribed Flexeril and an MRI. (Tr. 300.)

5.  Dr. Holton

On September 22, 2003, Connelly underwent a consultative examination performed by Dr. Michael Holton at the request of the Social Security Administration. (Tr. 183-86.)  Upon physical examination, Connelly exhibited normal gait and station, though she complained of

bilateral foot pain with walking on heels, toes, and tandem walking and developed moderate instability with such activities. (Tr. 183-86.)  Dr. Holton also noted that she had palpable tenderness extending through her paraspinal areas, that her range of motion was characterized by areas of moderate to marked stiffness, that her straight leg raising test was negative bilaterally, that her grip strength was four out of five bilaterally, and that there was evidence of tenosynovial inflammation of several finger joints and bilateral ulnar deviation. (Tr. 183-86.)

Connelly's neurological evaluation showed a diminished strength in the distal upper extremities but normal strength in the proximal upper extremities and lower extremities. (Tr. 183-86.)  Fine finger manipulations were performed with moderate bilateral stiffness, though she was eventually able to button, zip, and pick up a coin with either hand. (Tr. 183-86.)  Dr. Holton assigned a diagnosis of chronic musculoskeletal pain and stiffness attributed to a combination of osteoarthritis, rheumatoid arthritis and fibromyalgia/chronic fatigue syndrome, depression, hypertension, recurring headaches, and chronic bilateral foot pain status post surgeries. (Tr. 185.)

6. Dr. Sands

On October 21, 2003, Dr. J. Sands reviewed Connelly's medical record on behalf of the state agency. (Tr. 397-405.)  He concluded that she could perform work at the light exertional level, but that she had non-exertional limitations including only occasionally climbing ramps and stairs, balancing, and stooping; never climbing ladders, roofs, or scaffolds; never kneeling, crouching, and crawling; and avoiding all exposure to hazards. (Tr. 401.)  Dr. Sands's opinion was later affirmed by a second state agency physician. (Tr. 404.)

7. Dr. Bojrab

On July 23, 2004, Connelly was evaluated by Dr. G. David Bojrab, a pain management

specialist, for complaints of pain in her neck, low back, wrists, ankles, and shoulders. (Tr. 451-52.)  On physical examination, Connelly had pain upon range of motion of her bilateral shoulders and ankles, but neurologically there was no motor or sensory deficit noted. (Tr. 451-52.)  Dr. Bojrab adjusted Connelly's medication and assigned her a diagnosis of fibromyalgia, rheumatoid arthritis, and osteoarthritis. (Tr. 451-52.)  One month later, Connelly returned to Dr. Bojrab and reported a dramatic improvement in her joint pain, stating that it was a "three" on a ten-point scale. (Tr. 450.)  He again adjusted her medications. (Tr. 450.)

8. <u>Hospitals</u>

On January 1, 2005, Connelly visited the emergency room due to neck pain and chronic headaches; she explained that she had cervical surgery in November 2004 and that she had done well, but that she had experienced an increase in her pain recently, which she attributed to a reduction in her pain medications. (Tr. 690-93.)  She also complained of an occipital-type headache with some nausea, vomiting, photophobia, and blurred vision. (Tr. 690-93.)  Two days later Connelly visited another emergency room, complaining of constant, severe headaches in the occipital region. (Tr. 678.)  She reported, however, that her neck and upper extremity pain and numbness were completely resolved since her November 2004 neck surgery. (Tr. 678.)

**D.  Summary of the Medical Evidence Pertaining to Connelly's Mental Impairments**

1. <u>Dr. Davidson</u>

In August 2003, Connelly underwent a mental status examination by Neal Davidson, Ph.D., explaining to him that she was diagnosed with depression twenty years earlier, that she is constantly fatigued and feels like she could "crawl under a rock," that she experiences sleep problems and wants to stay in bed all day, and that she is frustrated. (Tr. 175-81.)  On mental

status examination, Dr. Davidson suspected that Connelly was exaggerating some of her symptoms, finding her complaints inconsistent with the fact that she successfully worked for the same company for thirty-six years. (Tr. 178.)  He concluded that she had a dysthymic disorder and rated her Global Assessment of Function ("GAF") as 53.[4] (Tr. 178.)

2.  Dr. Neville

In September 2003, K. Neville, Ph.D., reviewed Connelly's medical record on behalf of the state agency and concluded that her mental impairments were not severe. (Tr. 382-96.)  His opinion was later affirmed by a second state agency psychologist. (Tr. 382-96.)

3.  Ms. King, Mental Health Counselor

On November 21, 2003, Connelly began to attend weekly mental health sessions with Janice King, a licensed mental health counselor, with treatment focusing on helping her cope with pain management and the loss of her employment. (Tr. 297-98.)  Ms. King observed that Connelly's coming to her office for counseling appeared to physically stress her and that Connelly suffered from depression as a result of her pain and her physical inability to hold a job. (Tr. 297-98.)  She taught Connelly practical ways to live with the pain, including relaxing breathing exercises and a slower pace of activity. (Tr. 297-98.)  Ms. King assigned her a diagnosis of adjustment disorder with depressed mood, noting that her current GAF was 40 while

---

[4] Global Assessment of Functioning (GAF) is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness; the GAF excludes any physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).  A GAF score of 50-55 means an individual experiences serious or moderate symptoms or has a serious impairment or moderate difficulty in social, occupational, or school functioning. *Id.*

her GAF for the year was 50.[5] (Tr. 298.)

On November 1, 2004, Ms. King completed a mental residual functional capacity questionnaire on Connelly's behalf, noting that she had treated Connelly weekly from November 21, 2003, through April 2, 2004, and that counseling had resumed again on August 6, 2004. (Tr. 613-17.)  She reflected a diagnosis of dysthymic disorder, adjustment disorder, and anxiety disorder due to her general medical condition, stating that Connelly appeared "sickly" with poor color, that she experienced severe pain and anxiety resulting in depression, and that she could not stay focused on multi-task activities. (Tr. 613-17.)  Finally, Ms. King opined that Connelly would likely miss more than four days of work per month due to her impairments. (Tr. 613-17.)

4.  Dr. Rustagi

On October 8, 2003, Connelly visited Dr. P. Rustagi, a psychiatrist, reporting a long history of depression and chronic pain. (Tr. 190-95.)  On mental status examination, Connelly's judgment was found to be fluctuating, noting that it could "be awful and . . . impulsive at times." (Tr. 193.)  Her thought process indicated that it could race and that she had fears for the future; she also complained of short term memory loss. (Tr. 193.)  He assigned a diagnosis of dysthymic disorder and rated her GAF at 50. (Tr. 194.)

On October 28, 2004, Dr. Rustagi completed a mental residual functional capacity questionnaire, assigning a diagnosis of dysthymic disorder and panic disorder without agoraphobia and stating that her prognosis was guarded. (Tr. 541-45.) He rated her current GAF at 45 and her highest GAF for the past year at 50. (Tr. 541-45.)  He found that her medications

---

[5] A GAF score of 40 means some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).

caused side effects of fatigue, which had implications for her working, that her psychiatric condition exacerbated her experience of pain or other physical symptoms, and that she has intense chronic rage about her childhood. (Tr. 541-45.)  He concluded that Connelly would likely be absent from work more than four days a month due to her impairments. (Tr. 541-45.)

## II.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

14

## III.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On June 24, 2005, the ALJ rendered his opinion. (Tr. 18-31.)  He found at step one of the five-step analysis that Connelly had not engaged in substantial gainful activity beyond her alleged onset date, and at step two that she had severe impairments with respect to her osteoarthritis/rheumatoid arthritis and fibromyalgia. (Tr. 30.)  However, at step three, he determined that Connelly's impairments were not severe enough to meet a listing. (Tr. 30.)  Before proceeding to step four, the ALJ determined that Connelly had the following RFC:

> she is able to lift/carry 20 pounds occasionally and 10 pounds frequently; she is able to stand/walk a total of about six hours in an eight-hour workday, with normal breaks; she is able to sit a total of about six hours in an eight-hour workday, with normal breaks; she is able to occasionally climb ramps/stairs and is never to climb ladders, ropes, or scaffolds; she is able to occasionally engage in balancing/stooping; she is never to engage in kneeling, crouching, or crawling; and she needs to avoid all exposure to unprotected heights.

(Tr. 30.)  Based on this RFC, the ALJ concluded at step four that Connelly could perform her past relevant work as a production scheduler/planner. (Tr. 30.)  Therefore, Connelly's claim for DIB was denied. (Tr. 31.)

Connelly claims, however, that the ALJ erred in denying her DIB application by: (1) improperly evaluating the opinions of her treating physicians, Dr. Canavati, Dr. Brandenberger, and Dr. Rustagi; (2) failing to properly consider the opinion of her mental health therapist, Ms. King; and (3) incorrectly determining that her testimony of debilitating limitations was not "fully credible."  Each argument will be discussed in turn.

### C.  The ALJ Erred by Failing to Properly Evaluate the
### Opinions of Connelly's Treating Physicians

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this principle is not absolute, as "[a] treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB simply because her treating physician states that she is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner, *id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight

17

ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R.

§ 404.1527(d)(2).

1.  Dr. Canavati

      The ALJ chose not to assign controlling weight to the opinion of Dr. Canavati,

Connelly's treating neurologist, because he considered it "inconsistent with the other substantial

medical and nonmedical evidence of record," citing four pieces of evidence to support his

conclusion. (Tr. 29.)  Upon closer examination of the ALJ's reasoning, however, it is apparent

that at least two of the four pieces of evidence fail to support his decision to reject Dr. Canavati's

opinion and, furthermore, that the ALJ committed legal error in analyzing the opinion.

      More specifically, as a means to support his decision to reject Dr. Canavati's opinion, the

ALJ stated that Dr. Canavati recommended conservative treatment for Connelly in July 2002.

(Tr. 29.)  However, this evidence does little to discredit Dr. Canavati's opinion, as two years

later Dr. Canavati assigned Connelly limitations and advised Connelly that a cervical diskectomy

and fusion of her C5-6 and C6-7 levels may help to reduce her symptoms.  Dr. Canavati based

his April 2004 advice on Connelly's diffuse cervical tenderness, her restricted cervical range of

motion, and her MRI results, which showed a collapse of disk space, kyphotic deformity, and

severe bilateral stenosis at the C5-6 and C6-7 levels. *See Luna v. Shalala*, 22 F.3d 687, 690 (7th

Cir. 1994) (finding the most pertinent medical evidence to be the most recent treating

physician's examination); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003)

(emphasizing that an ALJ must not ignore evidence which contradicts his opinion, but must

evaluate the record fairly); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (articulating that

while "a written evaluation of each piece of evidence or testimony is not required, neither may

the ALJ select and discuss only that evidence that favors his ultimate conclusion" (internal citation omitted)).

The ALJ also rejected Dr. Canavati's opinion of Connelly's limitations because "she had not started the physical therapy that was ordered [by Dr. Zolman] as she was too busy with personal issues and wanted to wait." (Tr. 29.)  However, two weeks after Dr. Zolman recommended that Connelly begin physical therapy, he instructed her to wait until *after* her upcoming interventions by Dr. Canavati and Dr. Bojrab were completed, which included her cervical surgery that was scheduled for the upcoming week. (Tr. 669.)  An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p; *see also Herron*, 19 F.3d at 336 n.11 ("Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to a claim for disability benefits.").

Regardless of the foregoing, however, the ALJ committed legal error when analyzing Dr. Canavati's opinion.  After reaching his conclusion that the opinion did not merit controlling weight, the ALJ abruptly ended his analysis without ever analyzing the opinion with respect to the relevant factors, articulated *supra*, in 20 C.F.R. § 404.1527(d), and without assigning the opinion an appropriate weight. *See* SSR 96-2p; *Barry v. Barnhart*, No. 03 C 7239, 2004 WL 2092005, at *8 (N.D. Ill. Sep. 14, 2004).  The ALJ's wholesale discarding of Dr. Canavati's opinion in this manner constitutes legal error and serves as the basis for a remand. *Schmoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980) ("When the Secretary or the district court commits

19

an error of law, reversal is, of course, warranted irrespective of the volume of evidence supporting the factual findings.").

2. Dr. Brandenberger

The ALJ made the identical legal error with respect to the opinion of Dr. Brandenberger, Connelly's treating family practitioner. Specifically, he simply determined that the opinion was not entitled to controlling weight because it was "not well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] inconsistent with the other substantial medical and nonmedical evidence of record," failing to apply the relevant factors under 20 C.F.R. § 404.1527(d) and without assigning the opinion an appropriate weight.[7] (Tr. 28.) In doing so, the ALJ committed legal error that necessitates a remand. *See Schmoll*, 636 F.2d at 1150.

3. Dr. Rustagi

The ALJ chose to assign "little weight" to the October 2004 opinion of Dr. Rustagi, Connelly's treating psychiatrist, because he considered it "internally inconsistent with the findings on mental status examination that [Connelly's] mood was even, [her] sleep was good, and her medication was in good balance." (Tr. 28.) However, in reaching this conclusion, the ALJ failed to thoroughly evaluate the record.

To explain, Dr. Rustagi *also* found on mental status examination that Connelly's judgment was fluctuating and could be "awful" with impulsivity at times, that she "feels anxiety" and that her thought processes could race, that she felt a sense of "impending doom," and that

---

[7] In addition, the ALJ failed to adequately explain what "other substantial medical and nonmedical evidence" was inconsistent with Dr. Brandenberger's opinion. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review.").

she complained of short-term memory loss. (Tr. 445, 546-51, 561.)  Moreover, Dr. Rustagi

assigned her a GAF of 50 for the past year, indicating serious or moderate symptoms of

impairment of social or occupational functioning.  He also noted that her medication caused

fatigue, which has implications during a workday.  The ALJ must not simply ignore evidence

that contradicts his conclusion, but must evaluate the record fairly. *Golembiewski*, 322 F.3d at

917; *see also Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (opining

that when probative evidence is left unmentioned by the ALJ, the court is left to wonder whether

it was even considered).

Thus, the ALJ seemingly picked snippets of evidence from Dr. Rustagi's various mental

status examinations to support his desired conclusion, turning a blind eye to evidence that was

contrary to his opinion. *See Clifford*, 227 F.3d at 871.  In doing so, the ALJ failed to adequately

build a logical and accurate bridge between the evidence and the result, *see Diaz*, 55 F.3d at 307-

08; therefore, a remand of his decision is warranted.

### D.  The ALJ's Consideration of the Opinion of Connelly's Mental Health Therapist Is Not Supported by Substantial Evidence

The opinion of a licensed mental health counselor is not an "acceptable medical source"

under the Social Security regulations, but rather is considered an "other source." *See* 20 C.F.R. §

404.1513(d); SSR 06-03p; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1055 (E.D. Wis. 2005).

Though information from an "other source" cannot establish the existence of a medically

determinable impairment, it may be used "to show the severity of the individual's impairment(s)

and how it affects the individual's ability to function." SSR 06-03p; *Koschnitzke v. Barnhart*,

293 F. Supp. 2d 943, 950 (E.D. Wis. 2003).  "[T]he adjudicator generally should explain the

weight given to opinions from these 'other sources,' . . . when such opinions may have an effect

on the outcome of the case." SSR 06-03p; *Masch*, 406 F. Supp. 2d at 1055 (stating that opinions

from "other sources" must not be ignored).  "[D]epending on the particular facts in a case, and

after applying the factors for weighing opinion evidence, an opinion from a medical source who

is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical

source,' including the medical opinion of a treating source." SSR 06-03p.

> In evaluating Ms. King's opinion, the ALJ stated:
>
> The opinion of [Ms. King] given on November 1, 2004 is assigned even less
> weight as it is not from an acceptable medical source under Social Security
> Regulations.  Recognizing that the opinion must still be considered in the overall
> evaluation, it is not helpful in discerning [Connelly's] remaining work capacities
> as it appears [Connelly's] involvement with the counselor has been sporadic and
> most recently has addressed marital stressors and perceived injustices.

(Tr. 28-29 (internal citations omitted).)  The ALJ's reasoning, however, is not supported by

substantial evidence.

First, though the opinion of an "acceptable medical source" is required to establish the

existence of a medically determinable impairment, an opinion from a mental health therapist like

Ms. King, that is, an "other source," is not *automatically* entitled to less weight than the medical

opinion of a treating source. *See* SSR 06-03p.  Rather, the weight assigned to the opinion

"depend[s] upon the particular facts in a case." *Id*.

Second, although there was one break in service of several months duration, Ms. King

saw Connelly for weekly therapy sessions for an aggregate of seventh months, which calls into

question the ALJ's characterization of the relationship as "sporadic."  Moreover, in contrast to

the ALJ's statement, the record does not reflect that Ms. King's therapy focused most recently

on "marital stressors and perceived injustices," and the ALJ does not cite the source for his

conclusion.  Instead, Ms. King's notes in the record address pain management, Connelly's

adjustment to unemployment, and her history of childhood rage. (*See* Tr. 297-98, 613-17); *see Golembiewski*, 322 F.3d at 916-17 (remanding an ALJ's opinion for, among other reasons, a mischaracterization of the medical evidence of record).  Thus, the ALJ's reasoning with respect to Ms. King's opinion does not build an accurate and logical bridge between the evidence and his conclusion, *see Diaz*, 55 F.3d at 307-08, which must be remedied upon remand.

### E.  The ALJ's Credibility Determination Will Be Remanded

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Connelly contends that the ALJ erred when he found that her testimony of debilitating limitations was not supported by the objective medical evidence or her daily living activities and, thus, that it was "not fully credible." (Tr. 27.)  To support his conclusion, the ALJ pointed to much of the same objective medical evidence that he identified when rejecting the opinion of Dr. Canavati, including Dr. Canavati's 2002 recommendation for conservative management of Connelly's symptoms and Connelly's alleged failure to promptly pursue physical therapy.

23

However, as concluded *supra* in Section III.C.1, this evidence does not substantially support the ALJ's conclusion, as it fails to create "an accurate and logical bridge between the evidence and the result." *Shramek*, 226 F.3d at 811.

While the ALJ cited several other pieces of objective medical evidence in support of his credibility determination, some of this evidence *also* does not build an accurate and logical bridge between the evidence and his result.  For example, the ALJ cited in support of his credibility determination Dr. Ko's January 2003 initial examination findings, which stated that he was not able to really confirm the diagnosis of rheumatoid arthritis and that Connelly had only seven out of a possible eighteen fibromyalgia tender points. (Tr. 27.)  Yet, the opinion of the reviewing state agency physicians, to which the ALJ assigned "substantial weight," *also* reflected a primary diagnosis of "osteoarthritis/rheumatoid arthritis" and a secondary diagnosis of "fibromyalgia," as did the opinion of Dr. Holton, who examined Connelly at the request of the Social Security Administration. (Tr. 185, 397.)  Furthermore, Dr. Ko reported in February 2004 that Connelly had fibromyalgia "with increasing multiple tender points," yet the ALJ seemingly ignored this later opinion. (Tr. 300); *see Zurawski*, 245 F.3d at 888 (overturning the ALJ's credibility determination "because her decision offers no clue as to whether she examined the full range of medical evidence as it relates to [the claimant's] claim" (emphasis omitted)); *Caviness v. Apfel*, 4 F. Supp. 2d 813, 823 (S.D. Ind. 1998) (remanding the ALJ's credibility determination when the ALJ "failed to discuss a great deal of significant evidence and mischaracterized other evidence relevant to the credibility of [claimant's] subjective complaints").

Furthermore, after observing that Connelly was prescribed various medications, the ALJ

24

stated that "there is no suggestion of adverse side effects on the current medication regimen." (Tr. 28.)  This conclusion by the ALJ was "patently wrong," as Dr. Brandenberger stated in October 2004 that due to her multiple medications Connelly's "alertness and cognitive abilities are blunted and cause her to be less than capable of performing tasks." (Tr. 564, 724.)

The ALJ did, however, support his credibility determination by citing other accurate, objective medical evidence.  For example, the ALJ stated in his analysis that Connelly reported significant improvement in her neck and upper extremity pain and resolution of her upper extremity numbness after her November 2004 anterior diskectomy and fusion, and that there was "no indication of ongoing neurology services for headaches." (Tr. 28.)  In addition, the ALJ properly considered Connelly's daily living activities in his analysis, 20 C.F.R. § 404.1529(c)(3), stopping short of equating them to an ability to return to full-time employment. *Compare Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility), *and Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004), *with Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006) (cautioning ALJs "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home"), *and Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005).

Nonetheless, as concluded *supra*, the ALJ's opinion will be remanded so that the ALJ may properly consider the objective medical evidence contained in the opinions of Connelly's treating physicians and her mental health therapist.  Since the ALJ seemingly overlooked or mischaracterized some of this objective medical evidence and then relied upon it in making his credibility determination, it is most prudent to also remand his credibility determination, so that

the ALJ may better create "an accurate and logical bridge between the evidence and the result."[8] *Shramek*, 226 F.3d at 811; *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (cautioning courts not to "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.").   Therefore, the ALJ's credibility determination, particularly, his analysis of the objective medical evidence included in such determination, is remanded for further consideration.

## IV.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this opinion. The Clerk is directed to enter a judgment in favor of Connelly and against the Commissioner.  SO ORDERED.

Enter for this 19th day of April, 2007.

S/Roger B. Cosbey                           
Roger B. Cosbey,
United States Magistrate Judge

---

[8] Connelly also argues that the ALJ failed to consider her psychological problems in combination with her physical impairments when determining the credibility of her complaints.  Contrary to Connelly's assertion, "[n]o evidence in the record suggests that the ALJ failed to consider the combined effects of [Connelly's] impairments." *Robinson v. Apfel*, No. 97 C 8727, 1999 WL 160068, at *7 (N.D. Ill. March 12, 1999).  Rather, the ALJ specifically explained that the RFC by definition considers "the effects of physical and/or mental limitations that affect the ability to perform work-related tasks" (Tr. 27 (citations omitted)), and penned two paragraphs on Connelly's mental status in his opinion.  Thus, as explained *supra*, the ALJ's error centers on his improper consideration of the opinions of Connelly's treating physicians and mental health therapist, not a failure to consider her impairments in combination.